UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CRIMINAL ACTION NO. 5:19-CR-61-TBR

UNITED STATES OF AMERICA,     PLAINTIFF

v.

KRISTOPHER LEE WASHINGTON (1),     DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court upon Defendant Kristopher Lee Washington's Motion to Suppress. [DN 56; DN 63]. On August 20, 2020, the Court held a suppression hearing in Paducah, Kentucky. [DN 69; DN 72]. One witness for the United States was unable to attend the August 20 hearing. As such, counsel agreed to a continuance of the suppression hearing, and scheduled the hearing for September 25, 2020, in Paducah, Kentucky. [DN 71; DN 79]. Thereafter, the United States filed its Response to Washington's Motion on October 22, 2020. [DN 82]. Washington filed his Brief in Support of his Motion to Suppress on November 13, 2020. [DN 90]. This matter is now fully briefed and ripe for adjudication. For the reasons stated herein, Defendant's Motion to Suppress, [DN 56; DN 63] is **DENIED.**

## BACKGROUND

Defendant Kristopher Washington was indicted on November 19, 2019 for conspiracy to possess with intent to distribute/distribution of methamphetamine in violation of 21 U.S.C. §§ 846; 841(a)(1) and 841(b)(1)(B)(viii) (Count I), and possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii) (Count III). [DN 1]. Washington now moves the Court to suppress evidence obtained during a search of his vehicle as well as statements made by him to law enforcement at the Super 8 Motel in Central City, Kentucky on June 5, 2019. [DN 56; DN 63]. A bifurcated suppression hearing was held in part on August 20, 2020, and in part on September 25, 2020. At the suppression hearings, the government introduced the testimony of: (1) Special Agent Keith Varni of the Drug Enforcement Administration; (2) Detective Troy Gibson of the Muhlenberg County Sheriff's Department; (3) Lieutenant Will Ward of the Muhlenberg County Sheriff's Department; (4) Detective Dustin Awberry of the McCracken County Sheriff's Department; (5) Detective Jody Cash of the Marshall County Sheriff's Department; and (5) Detective Captain Jesse Riddle of the McCracken County Sheriff's Department. The government also introduced one exhibit—DVD of Washington's interview with Detective Riddle. [DN 72; DN 79]. The evidence at the suppression hearings establishes the following facts.

On June 4, 2019, Special Agent Keith Varni of the Drug Enforcement Administration (DEA) was contacted by Detective Donald Bowman of the Marshall County Sheriff's Department; Bowman requested assistance with an ongoing drug investigation. [DN 72 at 170]. Detective Bowman explained that three individuals (Jasmine Seay, Jerod Belcher, and Jerry Tynes) were arrested on June 4, 2019, after a controlled purchase and vehicle stop and seizure of approximately

fifteen (15) ounces of methamphetamine. *Id.* Special Agent Varni and Detective Bowman later interviewed the three individuals at the Marshall County Sheriff's Office. *Id.*

According to Varni, during Jasmine Seay's interview, she admitted to traveling with Belcher and Tynes to the Super 8 Motel in Central City, Kentucky on the morning of June 4, 2019, where she believed they intended to purchase methamphetamine. *Id.* at 171. Seay then rented Room 202 at the Super 8 Motel in her name using Belcher's credit card. Later that morning, a black male (who detectives later determined to be Kristopher Washington) arrived, and Belcher asked Seay to leave the room. *Id.* at 171, 194. Afterwards, as they left the hotel, Seay received a phone call from an individual seeking to purchase methamphetamine in Marshall County, Kentucky. Belcher and Seay agreed to proceed back to Marshall County to conduct the sale—which was the controlled buy that led to Belcher, Seay, and Tynes's arrest. *Id.* at 171–72.

Belcher was interviewed by Special Agent Varni and Detective Bowman after Seay. Pursuant to Varni's testimony, during Belcher's interview, he provided information identifying Kristopher Washington as the person who he had purchased one (1) pound of methamphetamine from earlier that morning (June 4, 2019) at the Super 8 Motel in Central City, Kentucky. *Id.* at 172. Belcher stated that he was introduced to Kristopher Washington by a man named "Chino," whom he met at a halfway house in Paducah, Kentucky. *Id.* According to Varni, Belcher described Washington as a black male adult who lived in Indiana; Belcher admitted to purchasing methamphetamine from Washington on more than one occasion. *Id.* He informed detectives that Washington normally drove a black BMW with an Indiana license plate. *Id.* at 173. Belcher also explained that he was supposed to contact Washington again and, in exchange for $3,200.00, Washington would provide Belcher another pound of methamphetamine. *Id.* Belcher agreed to

cooperate with law enforcement and made supervised contact with Washington to coordinate another methamphetamine purchase later that night at the Super 8 Motel in Central City. *Id.*

Varni testified that law enforcement corroborated the details provided by Seay and Belcher by reviewing surveillance footage of the meeting between Seay, Belcher, Tynes, and Washington on the morning of June 4, 2019 and the subsequent execution of the search warrant on the hotel room rented in Seay's name. *Id.* at 173–74. Law enforcement also obtained Washington's driver's license information with his photograph. *Id.* at 197. Regarding the surveillance footage, Varni stated that he did not review any footage from the Super 8 Motel himself. Instead, he referenced the observations made in written reports produced by the officers who watched the footage. *Id.* at 183. From these reports, Varni believed that officers observed Tynes, Seay, and Belcher on video sometime between 5:00a.m. and 9:00a.m., as well as an unknown black male who arrived around 8:00A.M. on June 4, 2019. Law enforcement concluded that the surveillance footage matched the details provided by Seay and Belcher. A copy of this surveillance footage was not provided in discovery or presented to the Court. When officers executed the search warrant for Super 8 Motel room 202 on June 4, 2019, they found a receipt in the trash with Jasmine Seay's name on it, as well as a piece of a plastic baggie in the trash containing suspected methamphetamine residue. *Id.* at 197–98. Detective Troy Gibson executed the search warrant and testified that officers did not find anything connected to Mr. Washington in the hotel room. [DN 72 at 202].

After the police had Belcher set up the meeting with Washington, Belcher continued to communicate with Washington while his calls and texts were monitored and supervised by Detective Donald Bowman. [DN 79 at 293]. At the same time, law enforcement conducted surveillance inside Room 202 at the Super 8 Motel, in the parking lot, and the surrounding areas. [DN 72 at 175]. Detective Bowman informed the officers conducting surveillance that Washington

would be driving a black BMW with a female present and they were supposed to deliver approximately one (1) pound of methamphetamine to Room 202 at the Super 8 Motel later that day or night. *Id.* at 198. They waited from approximately 3:45p.m. until shortly after midnight on June 5, 2019, when officers observed a black BMW with Indiana plates enter the motel lot and saw a black male and a white female exit the vehicle. *Id.* at 175. The black male was later identified as Mr. Washington. After exiting the vehicle, they made their way towards Room 202 where a surveillance team waited. Washington and the female were arrested upon knocking on the door to Room 202 at approximately 12:10a.m. *Id.* at 191, 198–99. After Washington was detained in the motel room, Lieutenant Will Ward was summoned to conduct a search of Washington's black BMW using his K9 partner Zen—a certified narcotics dog. *Id.* at 208. At approximately 12:25a.m., K9-Zen gave a positive alert on the odor of narcotics at the driver's side door. *Id.* at 191, 211. Following the K9's positive alert, two officers—Detective Dustin Awberry and Detective Jody Cash—conducted a search of Washington's vehicle and located approximately one (1) pound of methamphetamine in the passenger-side glove box as well as other illegal controlled substances in the center console. *Id.* at 215–17.

Once law enforcement located the methamphetamine inside Washington's vehicle, Detective Captain Jesse Riddle Mirandized Washington and began interviewing him regarding the incident that had taken place at the Super 8 Motel. [DN 79 at 292]. Washington acknowledged that drugs would be found in his vehicle, specifically Adderall, weed, and "ice," or methamphetamine. *Id.* at 293. Riddle testified that Washington was mostly cooperative during the interview, that he answered his questions and appeared alert. *Id.* at 293–94. When asked if he thought Washington was under the influence of drugs during the interview, Riddle testified that it was possible, but he was alert, answered his questions, and did not exhibit any visible signs of intoxication (swaying,

falling down, trouble standing). *Id.* at 294. The recorded interview with Washington was admitted as Government's Exhibit 1.

## LEGAL STANDARD

Searches and seizures conducted without a warrant issued by a judge or magistrate are per se unreasonable under the Fourth Amendment unless a specifically established exception applies. *Katz v. United States*, 389 U.S. 347, 357 (1967). When searches are conducted without a warrant, the government has the burden of showing that an exception applies. *Vale v. Louisiana*, 399 U.S. 30, 34 (1970). "The exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment, as well as derivative evidence acquired as a result of an unlawful search." *United States. v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963)). The government must prove by a preponderance that an exception to the exclusionary rule applies.

## DISCUSSION

### I. Police Had Sufficient Probable Cause to Arrest Defendant Washington

Defendant Washington seeks suppression of all statements and evidence obtained as a result of his arrest on June 5, 2019, arguing officers lacked probable cause to arrest him. In Washington's brief, he argues that the arrest was made without probable cause because "[a]t the time of Mr. Washington's arrest by police, no drugs had been found and therefore, law enforcement lacked the necessary probable cause to arrest Washington in the hotel corridor." [DN 90 at 376–77]. Washington points to his seemingly benign behavior as he pulled into the motel lot and walked to Room 202. He also highlights the fact that no drugs were found until *after* he was arrested. However, the evidence presented at the suppression hearing demonstrates that Washington's arrest

was supported by probable cause. At the time law enforcement arrested Washington, they had knowledge of sufficient facts and circumstances, based on reasonably trustworthy information, for them to reasonably believe that Washington was engaged in the sale of methamphetamine.

The Fourth Amendment protects the "right of people to be secure in their persons . . . against unreasonable seizures." U.S. Const. amend. IV. It is well established that "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir.2009) (alteration in original) (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). Probable cause "is a flexible, common-sense standard" assessed from the perspective of a reasonable officer on the scene at the time of arrest. *United States v. Romero*, 452 F.3d 610, 615–16 (6th Cir. 2006); *Klein v. Long*, 275 F.3d 544, 550 (6th Cir.2001). In determining whether probable cause exists, the Court must consider "whether, at the time of the arrest, the facts and circumstances within the arresting officer's knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent person to conclude that an individual either had committed or was committing an offense." *United States v. Torres-Ramos*, 536 F.3d 542, 555 (6th Cir. 2008) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Although a "mere suspicion of criminality" is insufficient, *Williams ex rel. Allen v. Cambridge Bd. Of Educ.*, 370 F.3d 630, 637 (6th Cir. 2004), probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity," *United States v. Ogbuh*, 982 F.2d 1000, 1002 (6th Cir.1993) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n. 13 (1983)).

The question before the Court is whether, at the moment of Washington's arrest, the facts and circumstances within the detectives' knowledge were sufficient to warrant a reasonable officer

believing that Washington had committed or was about to commit a crime. The Court finds that they were.

Here, Detective Captain Jesse Riddle and Detective Troy Gibson testified that Washington was arrested immediately upon knocking on the door to Room 202 at the Super 8 Motel where three law enforcement officers were awaiting his arrival. [DN 72 at 175, 203; DN 79 at 292]. Based upon evidence presented at the suppression hearings, the following information was known to police at the time of Washington's arrest:

- In a separate investigation, on June 4, 2019, Detective Bowman had arrested Seay, Belcher, and Tynes on charges of trafficking methamphetamine;

- Belcher agreed to be a cooperating witness and was being monitored and supervised by Detective Donald Bowman with the Marshall County Sheriff's Office;

- Seay and Belcher drove to the Super 8 Motel in Central City on June 4, 2019 to purchase methamphetamine;

- Seay and Belcher rented Room 202 and shortly after, a black male adult arrived, and Belcher asked Seay to leave the room;

- Belcher informed Detective Bowman and Special Agent Varni that on the morning of June 4, 2019, he went to the Super 8 Motel and purchased one (1) pound of methamphetamine from Washington;

- Belcher told Bowman and Varni that Washington was a black male adult who lived in Indiana and drove a black BMW with Indiana plates;

- Belcher had purchased methamphetamine from Washington on more than one occasion and Belcher was supposed to contact Washington again to purchase another pound of methamphetamine for $3,200.00;

- Detectives reviewing surveillance footage from the Super 8 Motel observed Tynes, Seay, and Belcher on video sometime between 5:00a.m. and 9:00a.m., as well as an unknown black male who arrived around 8:00a.m. on June 4, 2019;
- Detectives found a receipt with Seay's name on it in Room 202;
- Detectives obtained Washington's driver's license information and photograph;
- Belcher initiated monitored contact with Washington to arrange for Washington to come to the Super 8 Motel in Central City to deliver approximately one pound of methamphetamine to Room 202 later that night;
- Detective Bowman, who was monitoring Belcher's communications with Washington, informed the surveillance team that Washington was on his way to the Super 8 Motel and he would be arriving in a black BMW with a female present;
- Washington asked Belcher to confirm the room number;
- Detectives conducting visual surveillance outside of the motel observed a black BMW with Indiana plates pull into the back of the motel parking lot and a black male and white female exited the vehicle and walked towards Room 202;
- Washington knocked on the door to Room 202 at which point he and the female were arrested.

Prior to Washington's arrest, detectives had specific information connecting Washington to drug activity and to Belcher, Seay, and Tynes. Washington was mentioned by Belcher, a cooperating witness, during his post-arrest interview with Detective Bowman and Special Agent Varni as the individual who Belcher had purchased methamphetamine from earlier that morning at the Super 8 Motel. The information provided by Belcher and Seay was continually corroborated during the investigation by law enforcement officers' personal observations, thus providing

probable cause to arrest Washington. After arranging the transaction with Washington, Belcher provided accurate and detailed information about the arranged buy, including the location of delivery (Room 202 at the Super 8 Motel in Central City, Kentucky) and the time of delivery (late in the evening on June 4, 2019). Belcher also described Washington, the vehicle he would be driving, and noted that a female passenger would be present.

These elements were independently confirmed by the observations of the law enforcement team as Belcher's communications with Washington were organized and continuously monitored by law enforcement as Belcher and Washington negotiated the sale of a pound of methamphetamine. Belcher's identification of Washington was further independently corroborated by detectives when they viewed him on the Motel's surveillance footage, obtained his drivers' license information and photograph, observed Washington's message to Belcher confirming the delivery location as Room 202 at the Super 8 Motel, and when the surveillance team observed of the vehicle arriving at the arranged location as well as a black male and white female exiting the vehicle, consistent with Belcher's projection. Not only did the vehicle match Belcher's description, but law enforcement officers recognized Washington from the surveillance footage and his drivers' license photo. Officers then observed as Washington and his female companion walked to the arranged meeting spot—Room 202.

The Court finds that these facts corroborated Belcher's statements to law enforcement about Washington's sale of methamphetamine and enhanced the reliability of his information. By the time of Washington's arrest, detectives had independently corroborated most of the key elements of the transaction arranged by Belcher, and sufficiently warranted a reasonable officer's belief under the totality of the circumstances that Washington had committed or was about to commit an offense. *See United States v. Strickland*, 144 F.3d 412, 417 (6th Cir.1998) (holding that

"the corroboration of a certain amount of information provided by an informant can be sufficient to establish probable cause to arrest and search a criminal suspect"). Thus, probable cause existed to arrest Washington for trafficking methamphetamine.

Analogous decisions support the Court's conclusion here. *See United States v. Gill*, 685 F.3d 606, 610 (6th Cir. 2012) (finding probable cause to arrest, despite that the planned drug transaction had not yet taken place, where police had corroborated key elements of an informant's tip, including the color and make of defendant's vehicle and the location of the arranged drug sale); *Strickland*, 144 F.3d at 417 (finding probable cause to arrest where police had a detailed tip from an informant and had substantially corroborated those details, in spite of the fact that officers did not actually witness any illegal activity); *United States v. Jimenez*, No. 5:13-CR-45-TBR-1, 2014 WL 2816018, at *6 (W.D. Ky. June 23, 2014) (finding probable cause to arrest, despite having no specific information connecting the defendant with the target or with drug activity, where the delivery of meth was arranged by a known cooperating witness and detectives corroborated key elements of the transaction including the obscure meeting place located at a non-existent address fabricated by detectives). Here, Washington points to his seemingly benign behavior as he pulled into the motel lot and walked to Room 202. He also highlights the fact that no drugs were found until *after* he was arrested.  However, these concerns are overshadowed by the course of law enforcement's investigation leading up to his arrest. Law enforcement monitored as Washington confirmed he would sell a pound of methamphetamine to Belcher and agreed upon the location of the transaction. Washington then traveled to the prearranged location and law enforcement officers visually observed the black BMW pull into the Motel lot and observed Washington exit the vehicle and walk to Room 202. Accordingly, on these facts, the Court finds that the detectives had probable

cause to arrest Washington when they did. On these grounds and those that follow below, Washington's Motion to Suppress is denied.

## II. Search of Washington's Vehicle

Washington seeks suppression of evidence obtained from the search of his black BMW following his arrest on June 5, 2019, arguing that because he was arrested without probable cause, the discovery of drugs cannot be saved under the search incident to arrest doctrine or the automobile exception. [DN 90 at 377]. However, the record demonstrates that the warrantless search of the black BMW after Washington's arrest was lawful under the automobile exception to the warrant requirement because the arrest and subsequent search were supported by probable cause.

The automobile exception allows officers to conduct a warrantless search of a vehicle if there is probable cause to believe the vehicle contains evidence of a crime. *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998). *See also United States v. Padro*, 52 F.3d 120, 123–24 (6th Cir. 1995) (upholding warrantless search of vehicle where officer had probable cause to believe car contained cocaine based upon an informant's tip and officer's corroboration); *United States v. Brown*, 49 F.3d 1346, 1350 (8th Cir. 1995) (upholding warrantless search of vehicle when truck matched description given by informant and it arrived at location specified for drug transaction). Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion, and is found to exist when there is a fair probability that contraband or evidence of a crime will be found in a particular place. *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006); *Smith v. Thornburg*, 136 F.3d 1070, 1073 (6th Cir. 1998) (internal quotations omitted). Probable cause is determined based on the totality of the circumstances and the collective knowledge of all officers at the time of the search. *Collins v.*

*Nagle*, 892 F.2d 489, 495 (6th Cir. 1989). It is the Defendant's burden to demonstrate "a violation of some constitutional or statutory right justifying suppression." *United States v. James*, 575 F. App'x 636, 639 (6th Cir. 2014).

Here, the search of the black BMW by law enforcement demonstrates that, under the totality of the circumstances, the officers had probable cause to believe the vehicle contained methamphetamine. First, officers knew Washington was approaching the Motel in a black BMW with Indiana plates for the purpose of selling methamphetamine to Belcher, who was acting as a cooperating witness. Second, officers observed the vehicle as it arrived at the agreed-upon location and they subsequently identified Washington as he exited the vehicle and walked to the arranged meeting spot—Room 202. Because no drugs were found on Washington's person following his arrest, officers waited for Lieutenant Ward to search the black BMW using his K-9 partner. After the K-9's positive hit on the vehicle, officers searched the inside and located approximately one (1) pound of methamphetamine in the passenger glove box. The additional positive K-9 alert further supports probable cause to search the vehicle. *See Nykoriak v. Wileczek,* 666 F. App'x 441, 445 (6th Cir. 2016) (quoting *United States v. Diaz,* 25 F.3d 392, 393–94 (6th Cir. 1994)) (holding that positive indication by canine was "sufficient to establish probable cause for the presence of a controlled substance"). Accordingly, the Court reiterates that probable cause existed to support Washington's arrest, and finds that probable cause also existed to search the black BMW. As such, Washington has not satisfied his burden to show that the warrantless search of the vehicle violated the Fourth Amendment and his Motion to Suppress must be denied.

## III. Washington's Statements to Law Enforcement were Made Voluntarily

The government bears the burden of establishing, by a preponderance of the evidence, that a defendant's confession is voluntary. *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)

(citing to *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir. 1992)). It is also the government's burden to demonstrate that *Miranda* warnings were given, they were understood, and that they were waived before any admission resulting from the interrogation may be used in evidence against the defendant. *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966). "Involuntary or coerced statements must be excluded from a defendant's trial." *Colorado v. Connelly*, 479 U.S. 157, 163 (1986). In determining whether statements were involuntary or coerced, courts are counseled to examine the totality of the circumstances including personal characteristics of the defendant, whether the defendant has been adequately informed of his constitutional rights, and the length and extent of the questioning. *Mahan*, 190 F.3d at 423 (citing to *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)). Intoxication may also be considered, and the impact of any intoxication on the confession's voluntariness is evaluated on a "case-by-case basis and in view of the circumstances at play." *United States v. Hernandez*, 611 F. App'x 261, 267 (6th Cir. 2015) (not reported) (quoting *United States v. Montgomery*, 621 F.3d 568, 572 (6th Cir. 2010)).

Here, counsel argues that Washington was under the influence of drugs during his interview with Detective Captain Riddle. [DN 90 at 379]. As a result, he did not knowingly and voluntarily waive his *Miranda* rights before being questioned. *Id.* at 380. Therefore, all statements made by him during his interview must be suppressed. *Id.* Counsel states that when one listens to this recorded interview, it is clear that Washington is under the influence of intoxicating drugs. *Id.* Counsel points to Detective Riddle's inquiry about what substances Washington had taken recently as proof that Riddle believed Washington might have been intoxicated during the interview. *Id.* In response to Riddle's question, Washington told him that he had taken pain pills and smoked some weed. Counsel also argues that Washington's story was not coherent and his answers to certain questions were non-responsive.

At the suppression hearing, Riddle testified that after he read Washington his *Miranda* rights, Washington indicated he understood by shaking his head and engaging in conversation following the warnings. [DN 79 at 298]. Riddle stated that Washington was mostly cooperative during the interview, that he answered his questions and appeared alert. *Id.* at 293–94. When asked if he thought Washington was under the influence of drugs during the interview, Riddle testified that it was possible, but he was alert, answered his questions, and did not exhibit any visible signs of intoxication (slurring words, swaying, falling down, trouble standing). *Id.* at 294.

During the recorded interview, while looking through Washington's cell phone, Detective Riddle asked about various contacts and whether Washington had ever purchased methamphetamine from any of them. (Government Exhibit 1-DVD of Kristopher Washington Interview at 30:42:00–34:34:00). Washington told Riddle that he had only ever purchased meth from a guy named "Gary," but not anyone else. Riddle asked him "do you use meth too?" (Government Exhibit 1 at 34:34:00). Washington responded "no." *Id.* at 34:36:00. Riddle then asked, "**what kind of drugs have you used here recently?**" *Id.* at 34:39:00–34:42:00. Washington told Riddle he had taken "some pain pills and smoked a little weed." *Id.* at 34:45:00–34:50:00. Riddle asked if Washington's girlfriend had used any drugs "because she is exhibiting the signs of somebody that is under the influence of meth right now." *Id.* at 34:50:00–34:57:00. Riddle did not make the same verbal observation about Washington's demeanor during the interview, and he did not make any further inquiries about Washington's personal drug use.

Upon listening to the recorded interview, the Court believes that Washington appeared lucid throughout the interview with Detective Captain Riddle. Riddle properly Mirandized Washington before he began the interview and Washington did not invoke his right to remain silent nor he did demand counsel at any point during the interview. Thus, the Court finds that

Washington's statements were made voluntarily and Washington's Motion to Suppress must be denied.

## CONCLUSION

For the above stated reasons, **IT IS HEREBY ORDERED** that Defendant Washington's Motion to Suppress, [DN 56; DN 63], is **DENIED.**

**IT IS SO ORDERED.**

*[Signature: Thomas B. Russell]*

**Thomas B. Russell, Senior Judge
United States District Court**

December 16, 2020

CC: Counsel of Record